[Civ. No. 9437. Fourth Dist., Div. Two. May 28, 1970.]

WALLACE R. MUELDER, Plaintiff and Respondent, v. WESTERN GREYHOUND LINES, Defendant and Appellant.

## COUNSEL

Donald S. Gillespie and Wm. A. Flory for Defendant and Appellant.

Lonergan, Jordan & Gresham and Allen B. Gresham for Plaintiff and Respondent.

## OPINION

**TAMURA, J.**—Plaintiff sued to recover damages for the loss of a briefcase and its contents which defendant had undertaken to transport from Indio to San Bernardino. Following a nonjury trial the court found that the loss occurred through defendant's gross negligence, assessed damages in the sum of $7,637.70 for the actual value of the briefcase and its contents, and entered judgment for plaintiff accordingly. Defendant appeals from the judgment.

Defendant's sole contention is that under the applicable tariff schedule and sections 2200 and 2205 of the Civil Code, plaintiff's recovery should have been limited to $50.[1] The findings of gross negligence and the value of the lost items are unchallenged.

---

[1]Section 2200 of the Civil Code provides: "A common carrier of gold, silver, platina, or precious stones, or of imitations thereof, in a manufactured or unmanu-

Plaintiff, a professor of education, attended a meeting at the Coachella Unified School District in his capacity as special consultant to the district. Upon his departure, he inadvertently left in the school district superintendent's office a briefcase containing technical studies and reports, diaries, and miscellaneous correspondence. Plaintiff made arrangements with the superintendent to ship the briefcase to San Bernardino by defendant Greyhound Lines. The superintendent packaged the briefcase, took it to defendant's bus depot in Indio and deposited it with the terminal manager for shipment to San Bernardino. He paid the express charge and was given a receipt.

When plaintiff went to defendant's San Bernardino bus depot to claim the package, it could not be found despite a thorough search of the terminal. Ultimately the police found the briefcase, sans contents, in a rooming house near the San Bernardino Bus Terminal. There was evidence that at defendant's terminals baggage and packages were left unattended for long periods of time in places readily accessible to the public.

The applicable tariff ("Local, Interdivision and Joint Express Tariff No. Z-14-B"[2]) contained the following pertinent rules: It permitted shipments of 100 pounds or less at a valuation not exceeding $50 without additional charge but required an "excess value" charge for "released value" or "declared value" in excess of $50;[3] a shipment exceeding $200 "in declared

factured state; of time-pieces of any description; of negotiable paper or other valuable writings; of pictures, glass, or chinaware; of statuary, silk, or laces; or of plated ware of any kind, is not liable for more than fifty dollars upon the loss or injury of any one package of such articles, unless he has notice, upon his receipt thereof, by mark upon the package or otherwise, of the nature of the freight; nor is such carrier liable upon any package carried for more than the value of the articles named in the receipt or the bill of lading."

Section 2205 of the Civil Code, as it existed in April 1965, when the loss in the instant case occurred, provided: "The liability of any stage line, transfer company, or other common carriers operating over the public highways for the loss of or for damage to any baggage shall not exceed the sum of one hundred dollars for each trunk and its contents; twenty-five dollars for each valise, suitcase, or traveling bag and its contents; or ten dollars for each box, bundle, or package and its contents, unless a higher valuation is declared at the time of delivery of such baggage to the carrier and assented thereto in writing by such carrier."

The section was amended in 1965 increasing liability for the loss of each valise, suitcase, etc., from $25 to $50 (Stats. 1965, ch. 104) and was further amended in 1969 to increase liability for each box, etc., from $10 to $50 (Stats. 1969, ch. 982).

[2]The tariff was approved by and filed with the California Public Utilities Commission. Defendant is a "passenger stage corporation" and a "common carrier" as defined by the Public Utilities Act (Pub. Util. Code, §§ 211, 225, 226) and the Highway Carriers' Act (Pub Util. Code, § 3501 et seq.) and, as such is subject to those acts and the rules and regulations of the Public Utilities Commission.

[3]Rule No. 5 contained the following provisions respecting valuation: "(a) Shipments weighing one hundred (100) pounds or less may be valued by the shippers at amounts up to, but not exceeding fifty ($50.00) dollars without additional charge.

"(b) Where either the RELEASED VALUE, as agreed upon between the carrier and

or released value" could not be accepted; and rule 14(e) pertaining to the carrier's liability provided: "In consideration of the rate charged for carrying said property, which is dependent upon the value thereof and is based upon a released valuation of not exceeding fifty ($50.00) dollars for any shipment of 100 pounds or less, unless a greater value is declared at the time of shipment, the carriers parties to this tariff, shall not be liable in any event for more than fifty ($50.00) dollars for any shipment of one hundred (100) pounds or less, unless a greater value is declared by the shipper at the time of shipment and excess value charges paid. In no event shall the carriers be liable for more than the actual damages sustained."

The receipt ("Greyhound Busbill") was labeled "Shipper's Receipt." The following statement appeared in fine print on the edge of the receipt: "(NOT NEGOTIABLE) SUBJECT TO TARIFF REGULATIONS LIABILITY: The carrier will not pay over $50.00 for any shipment of 100 pounds or less, or 50¢ per pound actual weight for any shipment in excess of 100 pounds, unless a greater value is declared and charges for such greater value paid. Maximum valuation any one shipment is limited by tariff."

The school district superintendent testified he had no knowledge of the tariff provisions, saw no signs posted at the Indio terminal informing the public of its provisions, and did not read or sign the shipper's receipt. He further testified that when he deposited the package he told the terminal manager it was a briefcase containing books and papers but that the latter made no inquiry concerning value.

Defendant contends that, assuming the loss occurred through its gross negligence, its liability was nevertheless limited, as a matter of law, to the "released value" ($50) set by the rate schedule. The contention is grounded on the following proposition: The tariff rules limiting its liability were implied terms of the contract of shipment by operation of law and whether or not plaintiff had knowledge of those rules was legally inconsequential. Plaintiff counters that knowledge of the rules was an essential condition of his valid assent to the "released value" fixed by the tariff as the limit of the carrier's liability, at least where, as in the present case, loss occurred through gross negligence.

From the analysis which follows, we have concluded that the trial court impliedly found that plaintiff had no notice, actual or constructive, of the

the shipper, and evidenced by the uniform receipt given to the shipper by the carrier at the time of shipment or within a reasonable time thereafter or as otherwise agreed upon, or the DECLARED VALUE, as stated in writing by the shipper, exceeds the amounts set forth and provided for in paragraph (a) above, Excess Value Charges will be assessed in accordance with the provisions contained in Section C. hereof."

tariff rules limiting defendant's liability and that, hence, recovery for the actual value of the lost items must be sustained.

The law in this state on the issue posed by this appeal is unclear. There have been no cases on the subject in California since the Supreme Court decided *Hischemoeller* v. *National Ice etc. Storage Co.* (1956) 46 Cal.2d 318 [294 P.2d 433], which, though it involved limitations on the liability of a public warehouseman, cast some doubt on the continued vitality of several older decisions dealing with the effect to be given contractual arrangements and tariff regulations limiting a common carrier's liability for loss or damage to shipments. In view of the paucity and uncertainty of the law on the subject in this state, we believe it will be helpful preliminarily to review the common law and, because of the impact it has had on the development of the law in the intrastate field, the federal law on limitations on a common carrier's liability. We shall then proceed to a discussion of the pre-*Hischemoeller* California decisions, an analysis of *Hischemoeller,* and a determination of the effect of that decision.

# I

At common law common carriers were insurers against all losses of articles accepted for shipment except those resulting from acts of God or public enemy. (*Bohannan* v. *Hammond* (1871) 42 Cal. 227, 229; *Fairchild* v. *California Stage Co.* (1859) 13 Cal. 599, 602; Prosser, Law of Torts [3d ed.] p. 184.) A contractual stipulation or tariff having for its object the exemption of a common carrier from liability for its negligence was void as against public policy. (*Union Pac. R.R. Co.* v. *Burke* (1921) 255 U.S. 317 [65 L.Ed. 656, 41 S.Ct. 283, 284]; *Hart* v. *Pennsylvania R.R. Co.* (1884) 112 U.S. 331, 338-341 [28 L.Ed. 717, 720-721, 5 S.Ct. 151]; 6A Corbin, Contracts (1962) pp. 592-593; see Rest., Contracts, § 575.) But it was permissible for the parties, by a fair and reasonable "special contract," to provide for exemption from liability for accidental loss or damage, not occasioned by the carrier's negligence or fraud. (See *Franklin* v. *Southern Pac. Co.* (1928) 203 Cal. 680, 686 [265 P. 936, 59 A.L.R. 118]; *American Fruit Distributors* v. *Hines* (1921) 55 Cal.App. 377, 386 [203 P. 821].)

The common law recognized a distinction between a contract exempting a carrier from liability for negligence and one whereby, in consideration of a lesser rate, a shipper agreed to a valuation by which the carrier's liability was to be measured in the event of loss or damage to the shipment; such contracts, where the value so fixed was reasonable and the agreement was freely and fairly entered into by the shipper, were not deemed to be subject to the common law prohibition against contracts exempting a

carrier from liability for negligence. (*Adams Express Co.* v. *Croninger* (1913) 226 U.S. 491, 509-510 [57 L.Ed. 314, 321-322, 33 S.Ct. 148, 153]; *Hart* v. *Pennsylvania R.R. Co., supra,* 112 U.S. 331, 340-341 [28 L.Ed. 717, 720-721, 5 S.Ct. 151, 155-156].) However, a choice of rates with an opportunity to purchase greater protection by paying a higher rate was essential to the validity of such arrangements. (*Union Pac. R.R. Co.* v. *Burke, supra,* 255 U.S. 317, 321-323 [65 L.Ed. 656, 659-660, 41 S.Ct. 283, 284]; *Toyo Kisen Kabushiki Kaisha* v. *Willits & Co.* (9th Cir. 1927) 17 F.2d 762, 764; *Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680, 689; 6A Corbin, Contracts, *supra,* p. 595.)

Such agreed value contracts were sustained on the theory that by assenting to a fixed value in consideration of a lower rate, the shipper was "estopped" from claiming a higher value in event of loss; the courts reasoned that a shipper ought not to be "allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss." (*Hart* v. *Pennsylvania R.R. Co., supra,* 112 U.S. 331, 341 [28 L.Ed. 717, 721, 5 S.Ct. 151, 156].)

## II

Relying upon the rationale of the common law decisions sustaining agreed valuation contracts, the United States Supreme Court upheld fixed value limitations on liability in tariff schedules filed under the Interstate Commerce Act. (*Adams Express Co.* v. *Croninger, supra,* 226 U.S. 491, 512 [57 L.Ed. 314, 322-323, 33 S.Ct. 148, 154].) Shippers were held to be bound by such limitations even though they had no actual knowledge of the tariff rules; knowledge was presumed from terms of the shipping documents and the published tariff. (*American Ry. Express Co.* v. *Lindenburg* (1923) 260 U.S. 584, 591-592 [67 L.Ed. 414, 419, 43 S.Ct. 206, 209]; *Kansas City Southern Ry. Co.* v. *Carl* (1913) 227 U.S. 639, 652 [57 L.Ed. 683, 688, 33 S.Ct. 391, 395]; *Adams Express Co.* v. *Croninger, supra,* 226 U.S. at p. 509 [57 L.Ed. at p. 321]; *Cau* v. *Texas & Pac. Ry. Co.* (1904) 194 U.S. 427, 431 [48 L.Ed. 1053, 1056-1057, 24 S.Ct. 663].)

In the leading case of *Boston & Maine R.R.* v. *Hooker* (1914) 233 U.S. 97, 113 [58 L.Ed. 868, 876, 34 S.Ct. 526, 529], an interstate rail passenger was held to be bound by the tariff rules even though notice of the limitation on the carrier's liability had apparently been given by a statement on the baggage ticket.[4]

---

[4]The principle announced in *Boston & Maine R.R.* v. *Hooker* (1914) 233 U.S. 97 [58 L.Ed. 868, 34 S.Ct. 526], has also been applied to loss of baggage by interstate air carrier. (*Wadel* v. *American Airlines, Inc.* (Tex.Civ.App. 1954) 269 S.W.2d 855; *S. Toepfer, Inc.* v. *Braniff Airways* (W.D. Okla. 1955) 135 F.Supp. 671. See *Lichten* v. *Eastern Airlines, Inc.* (2d Cir. 1951) 189 F.2d 939 [25 A.L.R.2d 1337]. See Note, *Air-Carrier Tariff Limitations* (1957) 70 Harv.L.Rev. 1282, 1290.)

The filed tariff regulations were held to have "the force of a contract" binding upon the shipper and carrier despite the fact that the shipper may not have had actual or constructive notice of them.

The doctrine enunciated in *Hooker, supra,* is difficult to reconcile with the rationale on which agreed value arrangements were upheld at common law. A shipper who, through the carrier's failure to give adequate notice of tariff regulations, is not afforded a fair opportunity to buy greater protection by paying a higher rate can hardly be said to have "agreed" to the "released value" as a consideration for a lower rate. (See Note, *supra,* 70 Harv.L.Rev. 1282, 1290; Comment (1964) 52 Cal.L.Rev. 350, 360.) Nor is the doctrine consistent with the principle that an arbitrary value, unrelated to actual value, is ineffective as a limitation on liability for loss or damage through negligence where the tariff offers but a single rate. (*Union Pac. R.R. Co.* v. *Burke, supra,* 255 U.S. 317 [65 L.Ed. 656, 41 S.Ct. 283]; *Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680, 686-689.) Yet, this was the practical effect of charging a shipper with knowledge of tariff regulations, the terms of which had not been brought home to him by the carrier. As a result, as Mr. Witkin cogently observed: "The rule that a party charged with a duty of public service cannot exempt itself from liability . . . is largely theoretical; limitation of liability to such small amounts as to make litigation unlikely is usually permissible." (1 Witkin, Summary of Cal. Law (7th ed. 1960) p. 230.)

However, recent federal decisions have substantially nullified the effect of *Hooker, supra,* by distinguishing it on the basis of subsequent amendments to the Interstate Commerce Act. (*New York, N.H. & Hartford R.R. Co.* v. *Nothnagle* (1953) 346 U.S. 128 [97 L.Ed. 1500, 73 S.Ct. 986]; *Chandler* v. *Aero Mayflower Transit Co.* (4th Cir. 1967) 374 F.2d 129; *Mitchell* v. *Union Pac. R.R. Co.* (9th Cir. 1957) 242 F.2d 598.)

*New York, N.H. & Hartford R.R. Co.* v. *Nothnagle, supra,* 346 U.S. 128 [97 L.Ed..1500; 73 S.Ct. 986], was an action for loss of an interstate passenger's baggage. Under an amendment to the Interstate Commerce Act providing for the establishment of rates "dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property," the court held that the passenger was not bound by the "released value" specified in the tariff for the rate charged where she had no actual knowledge of the limitation, nor was informed of its existence by posted signs or the baggage receipt. The court stated: "[O]nly by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained. [Citations]. Bind-

ing respondent by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice; [fn. omitted] such an arrangement would amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts. [Citations] 'The great object of the law governing common carriers was to secure the utmost care in the rendering of a service of the highest importance to the community. A carrier who stipulates not to be bound to the exercise of care and diligence "seeks to put off the *essential duties* of his employment." *It is recognized that the carrier and the individual customer are not on an equal footing.* [Italics added.] "The latter . . . cannot afford to higgle or stand out and seek redress in the courts." ' *(Santa Fe, P. & P. Ry. Co.* v. *Grant Bros. Constr. Co.* (1913) 228 U.S. 177, 184-185 [57 L.Ed. 787, 791-792, 33 S.Ct. 474, 477].)" *(New York, N.H. & Hartford R.R. Co.* v. *Nothnagle, supra,* 346 U.S. 128, 135-136 [97 L.Ed. 1500, 1507, 73 S.Ct. 986, 990-991].) *Hooker* was distinguished in a footnote with the following comment: *"Boston & Maine R. Co.* v. *Hooker* (1914) 233 U.S. 97 [34 S.Ct. 526, 58 L.Ed. 868] and *New York Central & H. R.R. Co.* v. *Beaham* (1916) 242 U.S. 148 [37 S.Ct. 43, 61 L.Ed. 210], cannot control this case. Neither decision involved the Act as amended by the 1915 and 1916 legislation; both dealt with free baggage checked through on a passenger ticket; the carrier in both cases had supplied some notice of its limitation of liability." *(New York, N.H. & Hartford R. Co.* v. *Nothnagle, supra,* 346 U.S. 128, 136 [97 L.Ed. 1500, 1507, 73 S.Ct. 986, 990, fn. 12].)

In *Chandler* v. *Aero Mayflower Transit Co.* (4th Cir. 1967) *supra,* 374 F.2d 129, an interstate shipment of household goods was lost by fire through the carrier's negligence. The trial court granted the carrier's motion for a directed verdict limiting its liability to the "released value" for the rate charged despite evidence that the shipper did not sign the bill of lading and an "order for service" until after the goods were in transit. The shipper testified that the carrier's agent represented that the documents were merely an inventory of goods shipped. The reviewing court held that under the statute requiring a " 'declaration of value by the shipper *in writing* or a released value *in writing,*' " the "released value" in the tariff schedule was effective only if the shipper assented to it after having been given a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge.[5] In determining whether there was an agreement on "released value," the court held that principles applicable to the interpretation of standardized "adhesion contracts" governed. The court stated: "In cases where, as in the instant controversy, questions of mistake

---

[5]The case arose under Part II of the Interstate Commerce Act, formerly Motor Carriers Act of 1935, which incorporated by reference section 20(11) of the Interstate Commerce Act which was construed in *New York, N.H. & Hartford R.R. Co.* v. *Nothnagle,* 346 U.S. 128 [97 L.Ed. 1500, 73 S.Ct. 986].)

and fraud are raised in connection with the formation of contracts, limiting the liability of a common carrier, relevant circumstances and policies call for a not so strict application of pertinent principles of contract law to afford reasonable protection to the shipper. This is so because arrangements limiting liability contravene a strong public policy expressed in the common law [fn. omitted], come within a carefully defined exception to the general thrust of Section 20(11) of the Interstate Commerce Act placing on the carrier absolute liability for damage [fn. omitted] and are in operation attended by characteristics of an adhesion contract [fn. omitted]." (*Chandler* v. *Aero Mayflower Transit Co.* (4th Cir. 1967) *supra*, 374 F.2d 129, 135.)

*Mitchell* v. *Union Pac. R.R. Co.* (9th Cir. 1957) *supra*, 242 F.2d 598, involved the loss of a valuable show dog shipped across country by passenger train. On the authority of *Nothnagle, supra,* the court reversed a summary judgment for the carrier limiting plaintiff's recovery to the "released value" ($25) set by the rate schedule. One ground of reversal was that the shipper was entitled to a trial on the merits on the validity of his assent to the limitation. There was evidence that although the shipper's wife signed a "valuation slip" and placed on it the figure "$25," she did so hurriedly, at the urgent insistence of the baggage clerk, without reading the document. The court held that the principles announced in *Nothnagle, supra,* were controlling and that the trial court should probe further into the validity of the shipper's assent to the "released value."

The foregoing cases, though technically grounded on post-*Hooker* amendments to the Interstate Commerce Act indicate federal judicial retreat from that case. They appear to heed the views expressed by Mr. Justice Pitney in his dissent in *Hooker, supra,* quoted in part in footnote 6 below.[6] There is a growing recognition of the need to provide the unwary public greater protection against arbitrary nominal limitations on common carriers' liability.

---

[6] In his dissent in *Boston & Maine R.R.* v. *Hooker,* 233 U.S. 97 [58 L.Ed. 868, 34 S.Ct. 526], Mr. Justice Pitney, stated in part, at p. 532: "I have been unable to find a previous instance where any court, in this country, at least, in an action by shipper or passenger against common carrier for loss of freight or baggage, occasioned by the negligence of the carrier or its employees, has held the recovery to be limited to an arbitrary sum unrelated to the value of the goods lost, and this without any previous valuation or agreement assented to by the shipper or passenger, without any representation of value made by him, and without even notice brought home to him of any rule or regulation upon which the limitation of liability is based. The effect given by the present decision to a 'regulation' prescribed by the carrier, that, while formally promulgated, was in fact unknown to the passenger, seems to me an entire departure from the principles governing the duties and responsibilities of common carriers as heretofore recognized by this court and by the courts of the states generally, as laid down in the text-books and cyclopedias of law, and as reiterated and applied by this court in a recent series of notable decisions."

## III

In California common law liability of a common carrier is codified in section 2194 of the Civil Code.[7] (*Brignoli* v. *Seaboard Transp. Co.* (1947) 29 Cal.2d 782, 792 [178 P.2d 445]; *Anheuser-Busch Inc.* v. *Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 440, 166 A.L.R. 198].) ■ The common law right of a carrier to limit its liability by "special contract" for non-negligent loss or damage has been judicially recognized in this state (see *Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680, 686; *American Fruit Distributors* v. *Hines, supra,* 55 Cal.App. 377, 386) and is codified in section 2174 of the Civil Code. Section 2174 provides: "The obligations of a common carrier cannot be limited by general notice on his part, but may be limited by special contract."

Some uncertainty has been expressed whether section 2174 also abrogated the common law prohibition against contracts exempting a common carrier from liability insofar as ordinary negligence is concerned. (See 9 Cal.Jur.2d 828, 836.) In *Donlon Bros.* v. *Southern Pac. Co.,* 151 Cal. 763, 770 [91 P. 603], the court, by way of dictum, declared that the section had that effect. However, the dictum is inconsistent with repeated judicial pronouncements, both before and after *Donlon, supra,* that a common carrier may not contractually exonerate itself from liability for negligence. (*Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680, 686; *Pierce* v. *Southern Pac. Co.* (1898) 120 Cal. 156, 165 [47 P. 874, 52 P. 302]; *Hubbard* v. *Matson Nav. Co.* (1939) 34 Cal.App.2d 475, 477 [93 P.2d 846]; *American Fruit Distributors* v. *Hines, supra,* 55 Cal.App. 377, 386.) Those pronouncements have even more compelling force in view of the recently articulated doctrine that exculpatory provisions in contracts affecting the "public interest" are invalid. (*Tunkl* v. *University of Cal.* (1963) 60 Cal.2d 92, 96 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

■ Section 2175 of the Civil Code expressly preserves the common law prohibition against contractual exoneration of a common carrier from liability with respect to gross negligence. (*Walther* v. *Southern Pac. Co.* (1911) 159 Cal. 769, 774 [116 P. 51]; *Pratt* v. *West-*

---

[7]Section 2194 of the Civil Code provides: "Unless the consignor accompanies the freight and retains exclusive control thereof, an inland common carrier of property is liable, from the time that he accepts until he relieves himself from liability pursuant to sections 2118 to 2122, for the loss or injury thereof from any cause whatever, except:

"1. An inherent defect, vice, or weakness, or a spontaneous action, of the property itself;

"2 The act of a public enemy of the United States, or of this state;

"3 The act of the law; or,

"4. Any irresistible superhuman cause."

*ern Pac. R. R. Co.* (1963) 213 Cal.App.2d 573, 574 [29 Cal.Rptr. 108]; 1 Witkin, Summary of Cal. Law (7th ed. 1960) p. 231.) Section 2175 provides: "A common carrier cannot be exonerated, by any agreement made in anticipation thereof, from liability for the gross negligence, fraud, or willful wrong of himself or his servants."

California courts have upheld reasonable agreed valuation contracts "freely and fairly" entered into by the shipper with knowledge of the terms of limitation. (*Donlon Bros.* v. *Southern Pac. Co., supra,* 151 Cal. 763, 770; *Pierce* v. *Southern Pac. Co., supra,* 120 Cal. 156, 167; *Michalitschke Bros. & Co.* v. *Wells, Fargo & Co.* (1897) 118 Cal. 683, 690 [50 P. 847].) Such contracts were deemed to be outside the scope of the common law prohibition against contracts exonerating a common carrier from liability for either negligence or gross negligence and not within the proscription of section 2175 of the Civil Code. (*Donlon Bros.* v. *Southern Pac. Co., supra,* 151 Cal. 763, 768-769.) However, choice of rates and a fair opportunity to obtain higher valuation by paying a higher rate were essential to the validity of such arrangements. (See *Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680, 688; *Hubbard* v. *Matson Nav. Co., supra,* 34 Cal.App.2d 475, 477; *Reeder* v. *Wells, Fargo & Co.* (1910) 14 Cal.App. 790, 795-796 [113 P. 342].) And knowledge on the part of the shipper of the terms of limitation was deemed to be required by section 2176 of the Civil Code.[8] (*Curtis* v. *United Transfer Co.* (1914) 167 Cal. 112, 114 [138 P. 726]; *Merrill* v. *Pacific Transfer Co.* (1901) 131 Cal. 582, 589 [63 P. 915]; *Fitch* v. *Carpenter* (1945) 70 Cal.App.2d 827, 831 [161 P.2d 824]; *McQueen* v. *Tyler* (1943) 61 Cal.App.2d 263, 267 [142 P.2d 466]; *Murray* v. *Southern Pac. Co.* (1931) 112 Cal.App. 150, 156 [296 P. 667].)

Mere acceptance and retention of a receipt containing the terms of limitation was held not to constitute assent to the limitation as a matter of law. (*Curtis* v. *United Transfer Co., supra,* p. 114.) And a shipper was not chargeable with knowledge of the carrier's limitations on liability from the fact that they were contained in a published rate schedule approved by and filed with the Railroad Commission and from which carrier deviation was prohibited by law. (*Fitch* v. *Carpenter, supra,* p. 832; *McQueen* v. *Tyler, supra,* p. 268.)

---

[8]Section 2176 provides: "A passenger, consignor, or consignee by accepting a ticket, bill of lading, or written contract for carriage, with a knowledge of its terms, assents to the rate of hire, the time, place, and manner of delivery therein stated; and also to the limitation stated therein upon the amount of the carrier's liability in case property carried in packages, trunks, or boxes, is lost or injured, when the value of such property is not named; and also to the limitation stated therein to the carrier's liability for loss or injury to live animals carried. But his assent to any other modification of the carrier's obligations contained in such instrument can be manifested only by signature to the same."

This was the apparent state of the law in California until the decision in *Hischemoeller* v. *National Ice etc. Storage Co., supra,* 46 Cal.2d 318.

## IV

*Hischemoeller, supra,* 46 Cal.2d 318, involved the question whether a public warehouseman was entitled to the benefit of a "released value" limitation on liability contained in a tariff schedule approved by the Public Utilities Commission.[9] A jury found that spoilage occurred through defendant's negligence and awarded plaintiff damages for the actual value of the goods. The Supreme Court reversed. It held that the trial court erred in instructing the jury that "actual knowledge and understanding" by plaintiff of the terms of the warehouse receipt and tariff schedule limiting liability were essential to the effectiveness of the limitation. Applying a principle announced in motor carriers' actions against shippers for recovery of "undercharges" (*Gardner* v. *Basich Bros. Constr. Co.* (1955) 44 Cal.2d 191 [281 P.2d 521]; *Gardner* v. *Rich Mfg. Co.* (1945) 68 Cal.App.2d 725 [158 P.2d 23]), the court held that the tariff automatically became a part of the storage contract and the parties were deemed to have contracted with its provisions in mind.[10] The court disapproved "[a]ny statements in *Scotts' Valley Fruit Exch.* v. *Growers Refrigeration Co.,* 81 Cal.App.2d 437 [184 P.2d 183]; *McQueen* v. *Tyler,* 61 Cal.App.2d 263 [142 P.2d 466]; and *Fitch* v. *Carpenter,* 70 Cal.App.2d 827 [161 P.2d 824], contrary to the rule announced in *Gardner* v. *Basich Bros. Constr. Co., supra,* and which are relied on by plaintiff . . . ."

Defendant urges that *Hischemoeller, supra,* is dispositive of the case under review. It contends that under the rule announced in that case the tariff regulations automatically became implied terms of the contract and the fact that plaintiff had no knowledge of the limitation on liability is legally inconsequential.

For the following reasons we have concluded that *Hischemoeller* is not determinative of the rights and liabilities of the parties in the present case.

[9]Contractual limitations on warehouseman's liability is now governed by section 7204 of the Commercial Code.

[10]As a separate ground for reversal, the court held that the trial court erred in refusing to give defendant's requested instruction which read: "If you find that when the non-negotiable warehouse receipts (Plaintiff's Exhibit 1) and the transfer memorandum (Defendant's Exhibit A) were received by plaintiff's agents acting for him the circumstances were such that a prudent man could and would have read the limitation of liability on these documents, then you are instructed that in law the plaintiff had notice of the limitation of liability." The court held that the instruction was a correct statement of the law on defendant's secondary theory that plaintiff had constructive notice of the tariff provisions limiting defendant's liability.

*1. Difference in relative bargaining strength of the parties.*

In *Hischemoeller, supra,* the court noted that plaintiff was a knowledgeable businessman with considerable experience in warehousing. It characterized the storage contract as "an ordinary business transaction between businessmen." The Supreme Court has subsequently intimated that this factor may have been the controlling consideration in *Hischemoeller.* (See *Tunkl* v. *University of Cal., supra,* 60 Cal.2d 92, 97.) In such transactions between knowledgeable businessmen the need to invoke the law's solicitude for persons who unwittingly enter into improvident contracts can be said to be outweighed by the state's interest in the preservation of the integrity of the rate structure. Similar considerations were present in *Gardner* v. *Basich Bros. Constr. Co., supra,* 44 Cal.2d 191, and *Gardner* v. *Rich Mfg. Co., supra,* 68 Cal.App.2d 725, relied upon in Hischemoeller. Those cases were actions by truckers against shippers for the recovery of "undercharges." The public policy underlying such actions is the preservation of rate structures and maintenance of proper standards of service through the elimination of collusive agreements between shippers and carriers. (*Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 967 [59 Cal.Rptr. 836, 429 P.2d 156]; *People* ex rel. *Public Utilities Com.* v. *Ryerson,* 241 Cal.App.2d 115, 120 [50 Cal.Rptr. 246].) The abuses sought to be eliminated by such actions generally stem from the equal, if not superior, bargaining position of shippers over carriers.

The relationship between a member of the general public such as plaintiff and a common carrier stands on an entirely different footing. The superior bargaining power of a common carrier over a member of the public it serves has long been recognized. (*New York, N.H. & Hartford R.R. Co.* v. *Nothnagle, supra,* 346 U.S. 128, 136 [97 L.Ed. 1500, 1507-1508, 73 S.Ct. 986, 990]; *Santa Fe, P. & P. Ry. Co.* v. *Grant Bros. Constr. Co., supra,* 228 U.S. 177, 185 [57 L.Ed. 787, 791-792, 33 S.Ct. 474, 477]; *New York C. R.R. Co.* v. *Lockwood* (1873) 84 U.S. (17 Wall.) 357, 379 [21 L.Ed. 627, 640].)

*Hischemoeller, supra,* must be viewed in light of recent developments in the law pertaining to contracts between parties of unequal bargaining strength. Section 1668 of the Civil Code has recently been construed to prohibit provisions exonerating the party with the superior bargaining power from liability for its negligence where the contract is one affected with a "public interest."[11] (*Tunkl* v. *University of Cal., supra,* 60 Cal.2d 92, 96-98.) Under a related doctrine, exclusionary clauses in standardized "adhe-

---

[11]Section 1668 of the Civil Code provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law"

sion contracts" have been held to be ineffective in the absence of "plain and clear notification to the public." (*Steven* v. *Fidelity & Cas. Co.* (1962) 58 Cal.2d 862, 883 [27 Cal.Rptr. 172, 377 P.2d 284].) The Supreme Court has noted that under recent decisions, a contracting party offering services of a public or quasi-public nature has been denied the benefit of contractual limitations on liability contained in "adhesion" type contracts in the absence of *"an understanding consent."* (See *Steven* v. *Fidelity & Cas. Co., supra,* p. 883.) Bills of lading and shippers' receipts have been held to possess the characteristics of an "adhesion contract." (*Chandler* v. *Aero Mayflower Transit Co.* (4th Cir. 1967) *supra,* 374 F.2d 129, 135.)

2. *"Disapproval"* of *McQueen* v. *Tyler, supra,* 61 Cal.App.2d 263, *and* *Fitch* v. *Carpenter, supra,* 70 Cal.App.2d 827, *should be given limited effect.*

Defendant argues that *Hischemoeller's, supra,* disapproval of "any statements" in *McQueen* v. *Tyler, supra,* and *Fitch* v. *Carpenter, supra,* which are "contrary to the rule announced in *Gardner* v. *Basich Bros. Constr. Co., supra,*" means that tariff regulations limiting a common carrier's liability prevail over sections 2175 and 2176 of the Civil Code and are binding despite the absence of knowledge on the part of the shipper and even if loss occurs through the carrier's gross negligence.

What was precisely intended by the "disapproval" is not entirely clear. But in light of the recent developments in the law to which we have just alluded, we cannot give it the sweeping effect suggested by defendant. Assuming that disapproval was in reference to statements in the two cases (*McQueen* v. *Tyler, supra,* and *Fitch* v. *Carpenter, supra*) making knowledge on the part of the shipper a condition of valid assent to the limitation on liability, we believe it should be limited to commercial transactions between knowledgeable businessmen. It may be reasonable to presume that a sophisticated commercial shipper contracts with knowledge of tariff regulations but such presumption has no reasonable basis in experience in the case of a passenger or an ordinary member of the public contracting for the services of a common carrier for a non-business shipment.[12] We find no justification for charging a patron of a passenger common carrier with knowl-

---

[12]Under the Commercial Code adopted in 1963, the liability of a carrier under a *bill of lading* is covered by section 7309 which provides: "(1) A carrier who issues a bill of lading whether negotiable or nonnegotiable must exercise the degree of care in relation to the goods which a reasonably careful man would exercise under like circumstances. This subdivision does not repeal or change any law or rule of law which imposes liability upon a common carrier for damages not caused by its negligence.

"(2) Damages may be limited by a provision that the carrier's liability shall not exceed a value stated in the document if the carrier's rates are dependent upon value and the consignor by the carrier's tariff is afforded an opportunity to declare a higher value or a value as lawfully provided in the tariff, or where no tariff is

edge, as a matter of law, of the tariff regulations relating to the carrier's liability.

Despite the court's "disapproval" of *McQueen* v. *Tyler, supra,* 61 Cal. App.2d 263, we note that *McQueen* was later cited with apparent approval in *Stevens* v. *Fidelity & Cas. Co., supra,* 58 Cal.2d 862, 879-881, in connection with the court's observation that in standardized contracts between parties of unequal bargaining strength, the courts of California "have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable" citing, among other examples, exclusionary clauses in freight bills. The court stated at page 881: "*McQueen* v. *Tyler* (1943) 61 Cal.App.2d 263 [142 P.2d 466], notes that the carrier, relying upon such a provision in a freight bill 'must show that the shipper accepted the contract "with a knowledge of its terms." ' "

It is also noted that in *Mitchell* v. *Union Pac. R.R. Co.* (9th Cir. 1957) *supra,* 242 F.2d 598, the court relied upon *Fitch* v. *Carpenter, supra,* 70 Cal.App.2d 827, for the proposition that the shipper's knowledge of the limitation on liability was necessary to its effectuation. The court quoted extensively from *Fitch,* including the following passage: "The argument that as plaintiffs had the benefit of the lower rate they should bear the consequences which followed the acceptance of that rate is without force, inasmuch as there was no evidence that they had any knowledge that defendant's charges were based upon a restricted liability." (242 F.2d at p. 605.)

### 3. *Hischemoeller did not involve liability of a common carrier.*

Apart from the foregoing considerations, *Hischemoeller* involved the liability of a public warehouseman and not of a common carrier. Unlike common carriers, under common law and statutes declaratory thereof, the liability of a warehouseman is not that of an insurer; it is liable only for failure to exercise ordinary care. (Com. Code, § 7204; *George* v. *Bekins*

filed *he is otherwise advised* of such opportunity; but no such limitation is effective with respect to the carrier's liability for conversion to its own use. [Italics added.]

"(3) Reasonable provisions as to the time and manner of presenting claims and instituting actions based on the shipment may be included in a bill of lading or tariff."

The shipper's receipt in the instant case was not a bill of lading within the meaning of the Commercial Code (§ 1201, subd. (6)) and, hence, section 7309 is inapplicable. (See *Gastwirth* v. *P. Mashbitz & Sons, Inc.* (1964) 414 Pa. 445 [200 A.2d 766].) It is, therefore, unnecessary for us to determine whether in transactions governed by section 7309, a consignor would be chargeable as a matter of law with knowledge of tariff provisions limiting a carrier's liability. In this respect the language of the section is ambiguous. The Code Comment to the section notes that the second sentence of subdivision (1) leaves certain prior statutes unaffected by the adoption of the section, citing sections 2174, 2175, and 2176 of the Civil Code.

*Van & Storage Co.* (1949) 33 Cal.2d 834, 839 [205 P.2d 1037]; *Los Angeles Warehouse Co.* v. *American etc. Co.* (1943) 22 Cal.2d 402, 406 [139 P.2d 641]; *Scott's Valley Fruit Exchange* v. *Growers Refrigeration Co.* (1947) 81 Cal.App.2d 437, 445 [184 P.2d 183]; 92 C.J.S. 449, 450.) In addition, common carriers are subject to the provisions of section 2175 of the Civil Code prohibiting agreements exonerating them from liability for gross negligence and to section 2176 requiring knowledge on the part of the shipper of the terms of a ticket, bill of lading, or written contract of carriage limiting the carrier's liability. Those sections do not pertain to public warehousemen and were not considered in *Hischemoeller*.

We conclude that *Hischemoeller, supra,* does not require us to hold that plaintiff herein was, as a matter of law, chargeable with knowledge of the tariff regulations and bound by the "released value" as a limitation on the carrier's liability.

## V

Cases from other jurisdictions involving intrastate transactions are conflicting as to whether a patron of a passenger carrier is chargeable as a matter of law with knowledge of and bound by limitations on liability contained in tariff rules and regulations promulgated by a state regulatory commission.

In *Peninsula Transit Corp.* v. *Jacoby* (1943) 181 Va. 697 [26 S.E.2d 97] the court held that an intrastate bus passenger was chargeable with such knowledge and was, as a matter of law, bound by a $25 limitation on liability for loss of baggage. In *Campbell* v. *Tri-State Transit Co.* (1944) 196 Miss. 367 [17 So.2d 327], the court adopted the *Hooker* rule and limited an intrastate bus passenger's recovery for loss of baggage to $25 in accordance with tariff regulations approved by the state commission. (See also *Myers* v. *Atlantic Greyhound Lines* (1936) 52 Ga.App. 698 [184 S.E. 414].) In a federal district court case involving loss of a passenger's suitcase in an intrastate journey in California, the court cited *Hooker* and *Peninsula Transit Corporation* v. *Jacoby, supra,* and held that the passenger was chargeable with notice of the tariff regulations. (*Kirchoff* v. *Southern Pac. Co.* (N.D.Cal. 1946) 68 F.Supp. 877.) The court also held that liability was limited to $50 under section 2178 of the Civil Code.[13] Unlike the present case, however, there was no finding of gross negligence.

---

[13]Section 2178 of the Civil Code provides: "A common carrier of property by steam or electric railroad which accepts for transportation, storage, handling or safekeeping, as a part of or in connection with passenger transportation, property carried in trunks, valises, suit cases, traveling bags, boxes, bundles or packages, shall not be liable, in the event of loss of or injury to the same, for more than one hundred dollars for each trunk and contents, nor more than fifty dollars for each valise and contents, or suit case and contents, or traveling bag and contents, nor more than ten dollars for each box, bundle or package and contents, unless the carrier shall have consented in writing to assume a greater liability. The term 'common carrier' as used in this section shall include sleeping car companies."

On the other hand, in *Ferris* v. *Minneapolis & St. L. Ry. Co.* (1919) 143 Minn. 90 [173 N.W. 178] the court held that tariff limitation on liability for loss of an intrastate rail passenger's baggage was ineffective where the passenger had no knowledge of the terms of the limitation. The court noted but declined to follow the federal rule announced in *Hooker,* stating that Minnesota courts had long adopted the principle that limitation of a carrier's liability was a matter of contract. It further noted that the rule of the federal cases "has been substantially modified by Act of Congress. . . ." (173 N.W. at p. 180). Other states have likewise declined to follow the federal rule. (*John Hood Co.* v. *American Pneumatic Service Co.* (1906) 191 Mass. 27 [77 N.E. 638]; *Hill* v. *Adams Express Co.* (1911) 82 N.J.L. 373 [81 A. 859]; *Erie R. Co.* v. *Steinberg* (1916) 90 Ohio St. 189 [113 N.E. 814, 819]; *Kendall* v. *Teche Lines* (La.App. 1940) 197 So. 810.)

The doctrine enunciated in *Boston & Maine R.R.* v. *Hooker, supra,* 233 U.S. 97 [58 L.Ed. 868, 34 S.Ct. 526], was applied in the state court bus cases cited by defendant. (*Argo* v. *Southeastern Greyhound Lines* (1945) 72 Ga.App. 309 [33 S.E.2d 730]; *Royalty* v. *Southeastern Greyhound Lines* (1945) 75 Ohio App. 322 [62 N.E.2d 200]; see *Continental Bus System* v. *Ansel* (Tex.Civ.App. 1953) 253 S.W.2d 959.) However, those cases arose under the Federal Motor Carriers Act of 1935 (now Part II of the Interstate Commerce Act) and, moreover, antedated *New York, N.H. & Hartford R.R. Co.* v. *Nothnagle, supra,* 346 U.S. 128 [97 L.Ed. 1500, 73 S.Ct. 986]; *Chandler* v. *Aero Mayflower Transit Co.* (4th Cir. 1967) *supra,* 374 F.2d 129, and *Mitchell* v. *Union Pac. R.R. Co.* (9th Cir. 1957) *supra,* 242 F.2d 598. Where interstate shipments are involved, rights and liabilities of the parties are governed by Acts of Congress as interpreted by federal tribunals. (*Adams Express Co.* v. *Croninger, supra,* 226 U.S. 491 [57 L.Ed. 309, 33 S.Ct. 148]; *New York Central R.R. Co.* v. *Frank H. Buck Co.* (1935) 2 Cal.2d 384, 389 [41 P.2d 547]; *Franklin* v. *Southern Pac. Co., supra,* 203 Cal. 680.) An intrastate shipment, however, is governed by state law.

Since the present case involves a purely intrastate transaction governed by state law, we are not under compulsion to follow the federal rule as announced in *Hooker, supra,* (see *Donlon Bros.* v. *Southern Pac. Co., supra,* 151 Cal. 763; 1 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 834-835) and, for the reasons heretofore expressed, we are not disposed to follow it or the cases from other jurisdictions which have adopted it.

## VI

██ It is our conclusion that with respect to a transaction, such as was involved in the present case, a member of the general public is not bound

by a "released value" limitation on liability in a tariff regulation or a receipt, at least where loss occurs through the carrier's gross negligence, unless he contracted with knowledge of the limitation and of the existence of an opportunity to purchase higher liability. Such knowledge must be based upon actual or constructive notice. By constructive notice we mean such notice as would bring home to an ordinary reasonably prudent member of the public the terms of the limitation and the availability of a choice of purchasing greater protection. Whether such notice has been given in a particular case is a question of fact to be determined from all the circumstances. (*Curtis* v. *United Transfer Co., supra,* 167 Cal. 112; see *Hischemoeller* v. *National Ice etc. Storage Co., supra,* 46 Cal.2d 318, 323.)

■ In the present case we must assume an implied finding of absence of actual or constructive notice to plaintiff or his agent of the tariff regulations limiting defendant's liability. A reviewing court must infer all logical and reasonable findings in support of the judgment. (*Smalley* v. *Baker* (1968) 262 Cal.App.2d 824, 838 [69 Cal.Rptr. 521]; *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 226-227 [69 Cal.Rptr. 251].) Although defendant's witness testified that a sign "about 10 inches wide and about 16 inches-18 inches" long was posted at the express window informing the public of defendant's limitation on liability, the district school superintendent saw no such sign. Mere acceptance of a shipper's receipt did not constitute constructive notice, as a matter of law, of the terms of limitation printed thereon. (*Curtis* v. *United Transfer Co., supra,* 167 Cal. 112; see *California State Auto. etc. Bureau* v. *Barrett Garages, Inc.* (1967) 257 Cal.App.2d 71, 77 [64 Cal.Rptr. 699].)

## VII

We cannot agree with defendant's contention that, apart from the tariff regulations, its liability was limited to the amounts specified in sections 2200 and 2205 of the Civil Code. ■ Section 2200 was designed to protect carriers where unusually valuable contents of packages, such as gold or silver, are not disclosed by shippers. (See *Lowder* v. *Union Transfer Co.* (1926) 79 Cal.App. 598 [250 P. 703].) In the present case the superintendent told the terminal manager at Indio that the package consisted of a brief case containing books and papers.[14] ■ Insofar as section

---

[14]Rule 4b of the tariff lists certain items, including "private papers," as "prohibited articles" which are not acceptable for shipment. Rule 14b provides in part: "(b) *Unless caused in whole or in part by its own negligence,* or that of its employees or agents, the carriers shall not be liable for: . . . (3) Loss or damage to express shipments or packages which contained *undisclosed* Prohibited Articles listed in Rule No. 4(b) hereof." (Italics supplied.) In the instant case loss did occur through the carrier's gross negligence and the shipper did disclose the contents of the package. Thus under the tariff rules the fact that the package contained a "prohibited" article did not exonerate defendant from liability for its loss.

2205 is concerned, we have found nothing to indicate that the Legislature intended to limit a carrier's liability to the arbitrary nominal amount therein specified where loss occurs through the carrier's *gross negligence.* In view of its expressed policy against even contractual agreements exonerating a carrier from gross negligence (see Civ. Code, § 2175), it would not be reasonable to assume that the Legislature intended section 2205 to be such a limitation.

Judgment affirmed.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied June 17, 1970, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 22, 1970.